IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION


IN RE: AMY BEARD f/k/a AMY LYNN GARRISON, Debtor     No. 4:15-bk-14308
Ch. 7


ORDER AND OPINION GRANTING
UNITED STATES TRUSTEE'S MOTION TO DISMISS

This case has a long and rich history. On August 31, 2015, the debtor filed a skeletal chapter 7 petition in which she indicated that her debts were primarily "consumer/non-business." On September 14, 2015, the debtor filed her first set of schedules and statements, as well as her *Chapter 7 Statement of Current Monthly Income and Means Test Calculation* [initial means test]. The debtor's initial means test indicated a presumption of abuse. On November 25, 2015, the United States Trustee [UST] filed a motion to dismiss the debtor's case pursuant to 11 U.S.C. § 707(b)(1). On December 14, 2015, the debtor filed her response to the UST's motion to dismiss. On December 10, 2015, the UST filed a complaint for denial of the debtor's discharge (adversary proceeding 4:15-ap-1112). On January 6, 2016, chapter 7 trustee Frederick S. Wetzel, III [Wetzel] filed an objection to the UST's motion to dismiss based upon his determination that this was an asset case.

On January 8, 2016, Wetzel filed a complaint for turnover and determination of fraudulent conveyance (adversary proceeding 4:16-ap-1001). On May 20, 2016, the UST and Wetzel filed a joint motion asking the Court to hold the UST's motion to dismiss in abeyance pending the resolution of the two adversary proceedings. At the parties' request, the Court consolidated the adversary proceedings for trial, which began on September 4, 2018, and concluded on September 5, 2018. On December 4, 2018, the Court entered an order denying the relief sought by the UST and Wetzel in their respective adversary proceedings. On April 10, 2019, the UST filed an amended motion to dismiss, adding § 707(a) as a basis for dismissal of the debtor's case due to her alleged

failure to respond to the UST's request for copies of her 2016, 2017, and 2018 tax returns–both business and personal–and an affidavit from the debtor explaining any special circumstances refuting the presumption of abuse. Neither the debtor nor Wetzel filed a response to the UST's amended motion to dismiss. On May 15, 2019, the debtor filed amended schedules I and J, an amended statement of financial affairs, and an amended means test. The debtor's amended means test did not indicate a presumption of abuse.

The Court held a hearing on the UST's motion to dismiss and amended motion to dismiss [collectively, the UST's motion to dismiss] on July 25, 2019. Joseph A. DiPietro [DiPietro] appeared on behalf of the UST. Donald K. Campbell, III [Campbell] appeared on behalf of the debtor. Based on Wetzel's non-appearance at the hearing, the Court deemed his objection to the dismissal of the debtor's case withdrawn. At the beginning of the hearing, the UST orally amended his motion to dismiss to include a count under § 707(b)(3); the debtor did not object. In closing, the UST stated that he was no longer moving under § 707(a). At the conclusion of the hearing, the Court took the matter under advisement. For the reasons stated below, the Court grants the UST's motion to dismiss under § 707(b)(3).

**Background**[1]

The debtor is a physician. She graduated from medical school in 2009 and established Amy Garrison, M.D., PLLC [the PLLC] in 2011. In June 2012, the debtor took a job as

---

[1] Presumably because the parties believed that the Court was already familiar with this case as a result of having heard and ruled upon the two adversary proceedings in late 2018, they introduced almost no foundational information at the hearing on the UST's motion to dismiss. To allow an uninitiated reader to make sense of this opinion, the Court extracted the background information contained in the first paragraph of this section from its December 4, 2018 Order and Opinion [December 2018 order], docketed in 4:15-ap-1112 at entry [61] and in 4:16-ap-1001 at entry [44]. The Court did not rely upon the information taken from its December 2018 order in ruling on the instant matter, but included it for contextual purposes.

2

an emergency room physician in Batesville, Arkansas.  Around the same time, she
purchased a home in Cushman, Arkansas–near Batesville–with financing that she had
obtained from First Community Bank.  In June 2013, the debtor, through her PLLC,
opened a cash-only "concierge" medical practice in Greenbrier, Arkansas.  She
subsequently set up similar practices through her PLLC in Conway, Maumelle, and Little
Rock.[2]  In November 2013, the debtor left her job in Batesville and moved out of her
home in Cushman.  She stopped making mortgage payments to First Community Bank in
March 2015.  On August 19, 2015, the bank completed its foreclosure, leaving the debtor
with a deficiency judgment of $53,941.[3]

In April 2015–in addition to running her concierge medical practice–the debtor began
supplementing the income she earned through her PLLC by working in the emergency
room at CHI St. Vincent Morrilton [St. Vincent's].  In May 2015, she further increased
her income by picking up shifts at MedExpress Urgent Care [MedExpress].  On August
20, 2015, Jan Hodges [Hodges], a representative from Blue Cross Blue Shield [BCBS],
sent an email to the debtor's boyfriend [August 20 email] stating the following:[4]

> Paul, thanks for talking with me yesterday and explaining Dr. Beard's
> practice.  Based on our conversation, it is my understanding that Dr. Beard
> does not want to participate in the Blue Cross networks and be held to our

---

[2]  As of September 4, 2018, the debtor had closed all of her practice locations in
favor of a running an online or "virtual" practice.

[3]  The claims register in this case reflects that the debtor owed unsecured claims
totaling $116,360 on the date she filed her chapter 7 petition, including the bank's claim
for the post-foreclosure deficiency judgment in the amount of $53,941.

[4]  At the hearing on the UST's motion to dismiss, Campbell–the debtor's
attorney–represented that the August 20 email was sent by BCBS to the debtor.
However, as Scott Baber [Baber], the UST's bankruptcy analyst, pointed out during
Campbell's cross-examination, the email from Hodges was sent to Paul@H2MD.net and,
despite Campbell's assurance to Baber that "we'll get to that," neither he nor anyone else
clarified for the record that the recipient of Hodges's email was the debtor's boyfriend,
Paul Buch.  *See* December 18 order; *see also* Trial Tr. vol I, 162-63, Sept. 4, 2018
(identifying the email address of Paul@H2MD.net as Paul Buch's).  Although this fact is
not relevant to the Court's ruling, the Court includes it here for clarity.

fee schedule.  She is working part time at the SVI Morrilton ER to
supplement her income.

When she agreed to work for MedExpress or the ER, she was
credentialed/contracted into our networks with an effective date of
4/28/15.  I know you said she only worked for MedExpress for two
months and it didn't work out.  However, she is still participating in our
networks and has signed a contract to that effect.

Participating in the ABCBS networks means that Dr. Beard has agreed to
accept the responsibilities and reimbursement cited in the contracts no
matter where she works.  Therefore, she cannot remain participating in the
networks while working in the ER and non-participating in her private
practice.

The contracts can be termed with a 30 day notification, so please send me
a letter stating Dr. Beard wants to term her contracts.  Please send me the
letter by Friday, September 4, 2015, so that we can term her contracts
effective 9/30/15.  The letter can be scanned to me by e-mail or mailed to
the address in my signature line below.

Let me know if you have any questions.

Jan Hodges, MHP
AR Blue Cross and Blue Shield

Debtor's Ex. 1.

The August 20 email was the apparent culmination of a dispute between the debtor and
BCBS that had begun a few months earlier.  At the hearing on the UST's motion to
dismiss, the debtor testified that when she was going through the credentialing process to
work at St. Vincent's, BCBS advised her that she could not maintain her cash-only
practice while under contract with BCBS in connection with her employment at St.
Vincent's and other facilities.  As a result, BCBS informed the debtor that in order to
work at St. Vincent's–or any other medical facility–she would be required to close her
cash-based concierge practice or, alternatively, bring the practice under contract with
BCBS.  Because the debtor did not want to change the way she operated her practice, she
opted to terminate her contract with BCBS and forgo employment at outside medical

4

facilities.  According to the debtor, when she filed her chapter 7 petition on August 31, 2015, she believed that her sole source of income going forward would be the income generated by her PLLC.  However, according to the amended Schedule I filed by the debtor on May 15, 2019, BCBS  "modified their position" in December 2015.  At the hearing on the UST's motion to dismiss, the debtor testified that BCBS ultimately allowed her to do some emergency room work.  She also testified that "at one point" she worked at Arkansas Heart Hospital "on an on-call basis" but because it "did a number" on her health, she stepped down from her position as medical director.  Mot. to Dismiss Hr'g Tr. 88-89, July 25, 2019.[5]  The debtor testified that, as of the July 25, 2019 hearing, she had left her employment with the Arkansas Heart Hospital and the PLLC is now her only source of income.  Mot. To Dismiss Hr'g Tr. 89-90.

At the hearing on the UST's motion to dismiss, the parties focused on promoting their respective means tests.[6]  To that end, the UST offered into evidence three means test

---

[5]  Although the debtor alluded to suspected "heart issues" during the time she worked at Arkansas Heart Hospital, the Court has no evidence that the debtor was ever diagnosed with any specific health problem.

[6]  The means test is the computation required by § 707(b)(2) to determine whether a presumption of abuse arises.  The means test is calculated on Official Form 22A-1 entitled *Chapter 7 Statement of Your Current Monthly Income*.  Current monthly income is defined in the code as "the average monthly income from all sources that the debtor received . . . without regard to whether such income is taxable income, derived during the 6-month period ending on . . . the last day of the calendar month immediately preceding the date of the commencement of the case . . . ."  11. U.S.C. § 101(10A).  Official Form 22A-1 references § 101(10A) and instructs debtors as follows:

> Fill in the average monthly income that you received from all sources, derived during the full 6 months before you file this bankruptcy case.  11 U.S.C. § 101(10A).  For example, if you are filing on September 15, the 6-month period would be March 1 through August 31.  If the amount of your monthly income varied during the 6 months, add the income for all 6 months and divide the total by 6.

*See* UST Ex. 4.  The means test allows "debtors to deduct various monthly expenses from their current monthly income, including certain expenses specified in the collection

calculations: the debtor's initial means test, which indicated a presumption of abuse and stated that the debtor's current monthly income was $6840; the debtor's amended means test, which did not indicate a presumption of abuse and stated that the debtor's current monthly income was $5040; and the UST's means test figures, which reflected a presumption of abuse and stated that the debtor's current monthly income was $6150.[7] Baber–the bankruptcy analyst that performed the UST's means test calculations–testified that in order to calculate the debtor's current monthly income for purposes of the means test, the relevant look-back period in this case was February 1, 2015, through July 31, 2015.  Baber calculated the debtor's wages from her pay stubs and calculated the debtor's business income and expenses from the PLLC's bank statements.  However, Baber testified that because the debtor did not provide the UST with the PLLC's bank statement for July 2015–the last month comprising the six-month look-back period–he calculated the PLLC's income and expenses based on a five-month period.

At the hearing, the debtor established that the UST had  "double counted" two of the debtor's MedExpress checks–attributing the income once to the debtor personally and once to the PLLC as business income.  Similarly, the UST demonstrated that the debtor's figures were flawed because the debtor had included the expenses associated with her BMW twice–once as a personal expense and once as a business expense.  Although both parties successfully demonstrated that the other side's means test calculations were unreliable, neither party disputed the accuracy of the income stated on the debtor's tax returns.  In fact, the debtor confirmed that the income stated on her tax returns for 2014, 2015, 2016, and 2017 was correct.  According to the debtor's tax returns, in 2014, the debtor earned no income from wages and her business operated at a loss of $10,428 that

---

standards of the Internal Revenue Service."  *In re Justice*, 404 B.R. 506, 512 (Bankr. W.D. Ark. 2009) (citing 11 U.S.C. § 707(b)(2)(A)(ii)(I)).

   [7]  At the hearing on the UST's motion to dismiss, the debtor contended that her initial means test was wrong because the computer program did not allow her to input the negative numbers that she contends would have reflected accurately that her business was operating at a loss during the look-back period.

year.  In 2015, the debtor earned wages of $74,628 and her net business income was $33,318 for total income of $107,946.  In 2016, the debtor earned wages of $46,593 and her net business income was $37,322 for total income of $83,905.  In 2017, the debtor earned no income from wages but her net business income was $216,850.[8]  As for the debtor's expenses, her most recently filed Schedule J indicates that when the debtor filed her chapter 7 bankruptcy petition on August 31, 2015, her monthly expenses totaled $1577–with $981 of that amount being attributable to her BMW payment–a vehicle that the debtor confirmed she still owns.[9]  Neither party introduced evidence that the debtor's expenses have changed since she filed her chapter 7 case.

**Law & Analysis**

A party seeking the dismissal of a debtor's case under § 707(b)(1) "may elect to proceed under § 707(b)(2) or § 707(b)(3) or both as the UST has done in this matter.  In either instance, the party bringing the action for dismissal carries the burden of proof."  *In re Witek*, 383 B.R. 323, 326 (Bankr. N.D. Ohio 2007) (citation omitted).  Section 707(b)(2) sets out a "'means test' formula under which abuse may be presumed in instances where an ability to pay threshold is exceeded."  *Id.* at 327.  If the presumption of abuse does not arise under the means test–or is successfully rebutted–then "the Court may consider whether the case was filed in bad faith or whether 'the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.'"  *See In re Gourley*, 549 B.R. 210, 216 (Bankr. N.D. Iowa 2016) (quoting 11 U.S.C. § 707(b)(3).  Here, the UST moved for dismissal of the debtor's case under § 707(b)(2) based upon his means test calculation of the debtor's income and expenses–which he contends raised an unrebutted presumption of abuse–and under § 707(b)(3) based on the totality of the circumstances.

---

[8]  The debtor testified that she has not yet filed tax returns for 2018.

[9]  Ostensibly, the debtor's payment on the BMW remains the same as stated on her Schedule J, but no one asked the debtor that question.

7

Regarding the UST's motion to dismiss under § 707(b)(2), Baber testified that he calculated the debtor's current monthly income based on only five months' worth of financial information for the PLLC because the debtor did not provide the UST with the PLLC's July 2015 bank statement.[10]  As a result, the Court finds that the UST calculated the debtor's current monthly income in contravention of § 101(10A), which specifically requires that the calculation be based on the debtor's average monthly income for a specific six-month period.  The Court found no authority that would permit the calculation to be made based on the debtor's average income for fewer than six months.  Therefore, the Court declines to dismiss the debtor's case under § 707(b)(2).

However, after considering the totality of the circumstances of the debtor's financial situation, the Court finds that the debtor's case should be dismissed under § 707(b)(3).  Section 707(b) "focuses on whether the granting of a Chapter 7 discharge would be an abuse, not whether the filing of the case was an abuse." *In re Penninger*, No. 10-52061, 2011 WL 2709321, at *2 (Bankr. M.D.N.C. July 8, 2011).  Therefore, when analyzing the totality of the circumstances for purposes of dismissal under § 707(b)(3), "it is proper to consider the [debtor's] financial circumstances at the time of the hearing." *Id*.  In the Eighth Circuit, a debtor's "'ability to pay, standing alone, constitutes abuse under the totality of the circumstances.'" *In re Gourley*, 549 B.R. at 216 (quoting *In re Williams*, No. 10-03620-ALS7, 2011 WL 10468090, at *3 (Bankr. S.D. Iowa July 14, 2011) (citing *U.S. Trustee v. Harris*, 960 F.2d 74, 76 (8th Cir. 1992)).  In this case, the Court finds that the debtor has the ability to pay her creditors.  Although the debtor testified that her only

---

[10]  Although Baber indicated that it was the debtor's fault that he had to perform the UST's means test without the benefit of the PLLC's July 2015 bank statement, the Court notes that in the four years since the debtor filed her chapter 7 case, the UST never sought the Court's assistance in compelling the debtor to turn over the PLLC's July 2015 bank statement nor did the UST cite the debtor's failure to turn over the PLLC's July 2015 bank statement as a reason to dismiss the debtor's case when he filed his amended motion to dismiss on April 10, 2019.  Rather, the UST cited only to the debtor's failure to provide the UST with tax returns and an affidavit as a basis to dismiss her case under § 707(a).  Regardless, the UST abandoned § 707(a) as a basis to dismiss the debtor's case on the date of the hearing.

source of income is currently the PLLC, the evidence before the Court reflects that the PLLC has become quite profitable in the four years since the debtor filed her chapter 7 case. In fact, the debtor's most recent tax returns show annual net business income of $216,850, which equates to monthly income of $18,070. After subtracting the debtor's monthly expenses of $1577–which includes $981 per month for the debtor's BMW payment[11]–the debtor is left with a monthly surplus of $16,493 with which to pay her unsecured creditors. According to the claims register in the debtor's case, she owed $116,360 in unsecured claims as of the date she filed her bankruptcy case on August 31, 2015. Therefore, the Court finds that the debtor could pay off her unsecured debts in approximately eight months.[12]

Although a debtor's ability to pay is the primary factor considered by the Eighth Circuit in determining whether a chapter 7 case should be dismissed as abusive under the totality of the circumstances, other factors may also be relevant. For example,

> whether the bankruptcy filing was precipitated by an unforseen catastrophic event, such as sudden illness or unemployment; whether the debtor is eligible for relief for another chapter; whether there are non-bankruptcy remedies available to the debtor; whether the debtor can obtain relief through private negotiations; whether the debtor's proposed budget is excessive or unreasonable; whether the debtor has a stable source of future income; whether the debtor could provide a meaningful distribution in a Chapter 13 case; and whether the debtor['s] expenses could be reduced without depriving [her] and [her] dependents of necessities.

*In re Gourley*, 549 B.R. at 216 (quoting *In re Honkomp*, 416 B.R. 647, 649-50 (Bankr. N.D. Iowa 2009)). Here, the Court finds that the debtor's bankruptcy filing was precipitated, as least in part, by the debtor's decision to maintain her cash-based practice

---

[11] The only secured claim filed in the debtor's case was filed by Bank of America in the amount of $59,743, for the debtor's BMW.

[12] The debtor estimated in her schedules that she owed $122,567 in unsecured debt on the date she filed her chapter 7 case. However, even using the debtor's number, she could still pay off her unsecured debt in roughly eight months.

to the exclusion of maintaining her outside employment.  Although the debtor's choice to stop working at St. Vincent's and MedExpress in favor of keeping her cash-only practice resulted in a temporary decrease to her income, her voluntary choice is not tantamount to sudden unemployment.  Similarly, although the debtor and her counsel alluded to the debtor experiencing health problems that were ostensibly brought on by the stress of working shifts at outside medical facilities while also running her medical practice through the PLLC, the Court has no evidence that the debtor was ever diagnosed with an actual illness or disease that would rise to the level of a catastrophic event.  The Court further finds that the debtor is eligible for chapter 13 relief based on the amount of unsecured and secured debt that she had on the date she filed bankruptcy.  *See* 11 U.S.C. § 109(e).  In the same vein, the Court finds that the debtor could make a meaningful distribution to her creditors in a chapter 13 case–as the Court stated above, she could pay her unsecured creditors in full in about eight months.  Finally, the Court finds that the debtor has a stable source of future income–she is a physician with a successful practice.

**Conclusion**

For all of these reasons, the Court finds that the granting of relief under chapter 7 would be an abuse of the provisions of the chapter pursuant to 11 U.S.C. § 707(b)(3). Therefore, the Court grants the UST's motion to dismiss, subject to the debtor converting her case to a case under chapter 13 within 14 days of the date of the entry of this order.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:  09/04/2019

cc:     Donald K. Campbell, III, attorney for debtor
        Joseph A. DiPietro, attorney for UST
        All creditors and parties in interest

10